# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 05-CV-01855 (JFB)

---

DENIS GAMRAT,

Plaintiff,

VERSUS

JO ANNE BARNHART,
COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION,

Defendant.

---

MEMORANDUM AND ORDER
September 25, 2006

---

JOSEPH F. BIANCO, District Judge:

Plaintiff Denis Gamrat brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of defendant Commissioner of the Social Security Administration (the "Commissioner" and the "SSA," respectively) that plaintiff was not entitled to disability insurance benefits ("DIB") under the Social Security Act (the "Act"). The Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), requesting that the Court affirm her findings. Plaintiff opposes defendant's motion and cross-moves for judgment on the pleadings. For the reasons that follow, the defendant's motion is denied and the plaintiff's motion is granted to the extent it seeks remand for further review and denied to the extent it seeks reversal and remand solely for the computation of benefits.

I. BACKGROUND AND PROCEDURAL HISTORY

A. Prior Proceedings

On March 24, 2003, plaintiff applied for DIB alleging disability due to coronary artery disease, chest pain, back pain and left knee pain. (Record at 55, 63.) Plaintiff's application was denied, and he requested a hearing. (*Id.* at 26-30.) On November 9, 2004, plaintiff, represented by counsel, appeared at a hearing before Administrative Law Judge (the "ALJ") Joseph Halpern. (*Id.* at 207-23.) Gerald Greenberg, M.D., appeared at the hearing and testified as a medical expert. (*Id.* at 218-22.) The ALJ considered plaintiff's claim *de novo*, and, on November 30, 2004, issued a decision finding that plaintiff was not disabled because he was able to perform sedentary work. (*Id.* at 46-

54.) The Appeals Council denied plaintiff's request for review on March 9, 2005, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 307.) This appeal followed.

After describing the plaintiff's background, the Court will review the medical history, followed by the ALJ's findings.

B. Plaintiff's Age, Education, and Experience

Plaintiff is a forty-six year-old high school graduate who has completed one year of college. (Record at 69, 210.) He completed training at the New York City Police Academy (*Id.* at 69) and worked for the New York City Police Department from 1982 until November 2001. (*Id.* at 64.) He was retired as a sergeant on a disability pension due to coronary artery disease in January of 2002 and receives a three-quarters disability retirement package. (*Id*. at 210-11.)

C. Non-Medical Evidence

Plaintiff claims that he experiences chest pain lasting from thirty seconds to three minutes, occurring either two or three times per day, but sometimes he can go for a week without any chest pain. (*Id*. at 212.) He deals with the pain by taking nitroglycerin. (*Id*. at 212.) To deal with the headache he gets from the nitroglycerin, plaintiff takes two aspirin. (*Id*.) Plaintiff also reported that he sometimes experiences dizziness or shortness of breath when he gets the chest pains, but not every time. (*Id*. at 215.) He also claims that he experiences lower and upper back pain one to three times per day. (*Id*. at 212) He reports a herniated disc and described the pain as "excruciating." (*Id*.)

Plaintiff claims that he is able to sit for one-half hour, and that he spends most of his time lying down watching television. (*Id*. 213-14.) He reports being able to stand for one-half hour before experiencing pain, and he is able to walk approximately two blocks before needing to rest. (*Id.* at 214.)

Plaintiff, in addition to nitroglycerin, takes Norvasc, Lipitor, aspirin, vitamin supplements and folic acid. (*Id*. at 215.) Plaintiff testified that he is always tired, but he was not sure whether that was caused by his medication or his heart condition. (*Id*. at 216.) He reported that he must nap twice daily. (*Id*.)

D. Medical Evidence

In November 2001, plaintiff was experiencing symptoms of angina and underwent a coronary angiography, a left heart catheterization, and a left venticulography at North Shore University Hospital. (*Id*. at 127-35.) Cardiac catheterization revealed 95% stenosis of the proximal segment of the left posterior descending branch of the left circumflex artery, and 75% stenosis of the proximal segment of the right coronary artery. It was noted that the proximal segment of the right coronary artery was a small vessel, but the proximal segment of the left posterior descending branch of the left circumflex artery was a moderate sized vessel. (*Id*. at 128.) The tests revealed two vessel coronary artery disease (the left circumflex and right coronary arteries), normal left ventricular function, no evidence of mitral regurgitation and elevated left ventricular end diastolic pressure. (*Id*. at 127-28.) Plaintiff underwent a successful coronary stent insertion in the proximal left posterior descending branch. (*Id*. at 129-30.) Upon discharge from the hospital, plaintiff was prescribed Lipitor, aspirin and Plavix and advised not to engage in strenuous activity for two weeks. (*Id*. at 125.)

At a follow-up appointment with his treating cardiac surgeon, Dr. Stephen Green, on December 6, 2001, plaintiff reported being asymptomatic since his surgery and that he was engaging in mild physical activities. (*Id*. at 121.) Upon examination, plaintiff's blood pressure was 124/76, his heart had a regular rate and rhythm with no clicks or murmurs, and an electrocardiogram ("EKG") was normal. (*Id*. at 121, 124.) Dr. Green described plaintiff as clinically stable, recommended that he continue with current medications, and cleared plaintiff to resume physical activities, including exercise for twenty to thirty minutes per day. (*Id*. at 121-22.)

On December 12, 2001, plaintiff began to receive treatment from Dr. Anthony P. Spera, plaintiff's cardiologist from Queens-Long Island Medical Group, P.C. Dr. Spera reported that plaintiff was taking aspirin, Lipitor and Plavix. (*Id*. at 149.) At this time, plaintiff reported that he was attempting to lose weight and stop smoking. (*Id.*) A stress test done that day was negative for ischemia, chest pain and arrhythmia, and there was normal blood pressure response with exercise. (*Id.*) Upon examination by Dr. Spera at this time, plaintiff's blood pressure was 120/80, and his heart had a regular rhythm. (*Id.*) Dr. Spera reported that the claimant had residual stenosis of the right coronary artery, and that he was currently disabled from full-duty police work. Dr. Spera stated that he would continue plaintiff's medical therapy, that plaintiff would continue to see his primary care physician, Dr. Nguygen, for blood pressure checks and laboratory studies, and that plaintiff would follow up with him on a periodic basis. (*Id.*) He also referred plaintiff for a nutritional evaluation and provided plaintiff with a prescription pad note stating that plaintiff was currently disabled from full-duty police work. (*Id.* at 119-20.)

On January 4, 2002, the physicians on the Police Medical Board, after examining plaintiff and reviewing his records, concluded that plaintiff could not perform the full duties of a New York City police officer and recommended disability retirement, based on diagnoses of right coronary artery disease and status post stenting in the left posterior descending branch of the circumflex artery. (*Id.* at 91-93, 100.)

Plaintiff was seen for a cholesterol screening at Queens-Long Island Medical Group, P.C., on January 24, 2002. (*Id*. at 151.) Plaintiff reported feeling good and denied shortness of breath. (*Id.*) His blood pressure was 100/70, and his heart had a regular rate and rhythm. (*Id.*) His cholesterol was normal. (*Id*.)

Plaintiff returned to the Queens-Long Island Medical Group, P.C. on June 19, 2002, reporting chest discomfort for the previous three days and left knee pain. (*Id*. at 154.) His blood pressure was 120/70. (*Id*.) Plaintiff was referred to Dr. Spera, who ordered a stress EKG. (*Id*. at 109) The test was negative for ischemia. (*Id.*) During testing, plaintiff did not experience chest pain or shortness of breath, and he had a normal blood pressure response. (*Id*.)

Plaintiff was seen on July 11, 2002 at Queens-Long Island Medical Group, P.C. by Dr. A. Pluchinotta, an orthopedist, for left knee pain of two months' duration. (*Id*. at 152.) Plaintiff stated that he mostly experienced the pain with prolonged knee flexion or climbing stairs. (*Id*.) Upon examination, plaintiff had a normal gait. Although there was tenderness and crepitus, there was no joint line tenderness or effusion, and range of motion was full. (*Id*.) X-rays of the knee revealed initial degenerative joint disease of the left knee. (*Id*.) Plaintiff was

3

diagnosed with patellofemoral syndrome/initial degenerative joint disease of the left knee, prescribed a knee brace and advised to return in four weeks. (*Id*.)

On August 1, 2002, plaintiff was seen by Dr. Matsuko Takeshige at Queens-Long Island Medical Group, P.C. (*Id*. at 153.) Upon examination, blood pressure readings were 130/80 and 138/80. (*Id*.) The heart had a regular rate and rhythm. (*Id*.) Plaintiff was told to continue taking aspirin and Lipitor. (*Id*.)

On February 7, 2003, plaintiff was seen by Dr. Spera, the cardiologist, who reported that plaintiff had been seen by his family physician (Dr. Takeshige) earlier that day with complaints of some recurrent chest pain over the previous month or so. (*Id*. at 148.) An EKG revealed evidence for sinus rhythm with a Q-wave in lead III along with inverted T-waves in leads III and a VF. (*Id*.); *see* (*Id*. at 111.) Plaintiff was referred for cardiac testing at North Shore University Hospital. (*Id*. at 148; repeated at 156.)

Plaintiff underwent pre-admission testing and examination at North Shore University Hospital on February 11, 2003, for his recurrent episodes of chest pain. (*Id*. at 113, 14.) Plaintiff reported chest pain during the previous two or three months lasting several seconds and occurring approximately weekly, but denied shortness of breath or palpitations. (*Id*.) Plaintiff had a regular heart rate and rhythm without murmurs or gallops. (*Id*.) Cardiac testing, including coronary angiography, left heart catheterization and left venticulography revealed one vessel coronary artery disease (75% single discrete stenosis of the proximal segment of the right coronary artery), normal left ventricular function with a calculated ejection fraction of 57%, and no evidence of mitral regurgitation. (*Id*. at 116-17.) No intervention was required, and it was recommended that the plaintiff be managed with medical therapy. (*Id*. at 117.)

On February 12, 2003, an EKG revealed sinus bradycardia. (*Id*. at 137-38.)

When plaintiff was seen by Dr. Spera on March 12, 2003, he denied any recurrent chest pain. (*Id*. at 155.) Dr. Spera described plaintiff as stable. (*Id*.) He continued plaintiff's medication, and recommended that plaintiff follow a low-salt, low-cholesterol diet. (*Id*.)

On April 15, 2003, plaintiff complained to Dr. Takeshige of right testicle and low back pain radiating to the right thigh. (*Id*. at 147.) Plaintiff stated that he had a history of a herniated disc at L5, caused by an injury while working. (*Id*.) Plaintiff was diagnosed with low back pain with sciatica. (*Id*.)

On May 14, 2003, a consultative examination was performed by Dr. Jerome Caiati on behalf of the Social Security Administration. (*Id*. at 162-67.) Plaintiff reported that his chest pain occurred two to three times per week and was relieved with nitroglycerin in ten minutes. (*Id*. at 162.) He claimed that, in 1989, he was diagnosed with a herniated disc. (*Id*.) He stated that, in 2002, he developed right knee pain, which was diagnosed as joint effusion. In 2003, he was found to have elevated liver function studies, for which work-up was in progress. (*Id*.) Plaintiff's medications were Norvasc, Lipitor, NitroQuick sublingual and aspirin. (*Id*. at 163.) He used no assistive devices for ambulation. (*Id*.) He stated that he was able to cook, clean, do laundry, shop, shower, bathe, dress, watch television, listen to the radio, read and go out. (*Id*.)

4

Upon examination, plaintiff was five feet, ten inches in height and weighed 249 pounds. (*Id*.) His blood pressure was 110/80. (*Id*.) The heart had a regular rhythm, and there was no audible murmur, gallop or rub. (*Id*. at 164.) Plaintiff appeared to be in no acute distress. (*Id*. at 163.) Gait was normal, and plaintiff was able to walk on his heels and toes without difficulty. (*Id*.) Stance was normal, and he was able to fully squat. He needed no help changing for the examination or getting on and off the examination table. (*Id*.) He was able to rise from his chair without difficulty. (*Id*.) Physical examination revealed a normal range of motion of his lumbar spine. (*Id.* at 164.) Straight leg raising was negative bilaterally. (*Id*.) There was full range of motion of the shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally. (*Id*.) Strength was full in the upper and lower extremities. (*Id*.) There were no evident subluxations, contractures, ankylosis or thickening. The joints were stable and not tender. (*Id*.) There was no redness, heat, swelling or effusion. There were no motor or sensory deficits. (*Id*.) There was no cyanosis, clubbing, edema or atrophy. (*Id*.) An EKG revealed a regular sinus rhythm. (*Id*. at 165, 167.) A chest x-ray revealed an enlarged cardiac diameter, an unfolded aorta and no active lung disease. (*Id*. at 166.) X-rays of the lumbar spine revealed L5-S1 disc space narrowing and straightening of the lordotic curve. (*Id*.)

Dr. Caiati diagnosed unstable angina, hyperlipidemia, lumbosacral herniated disc, right knee effusion with full range of motion on physical examination and elevated liver function studies. (*Id*. at 165.) The doctor concluded that plaintiff's abilities to sit, stand, reach, bend, push and pull were unrestricted. (*Id*.) Due to angina, plaintiff's abilities to walk, climb and lift were mildly limited. (*Id*.)

Dr. Caiati performed a treadmill exercise test on June 11, 2003. (*Id*. at 168-86.) The exercise was terminated because of low back and left knee pain (*Id*. at 169), and the test was considered non-diagnostic because plaintiff did not achieve the target heart rate. (*Id*. at 168.) The test was negative for ischemia or arrhythmia. (*Id*. at 169.) During recovery, plaintiff's low back pain resolved in one minute, and his left knee pain resolved in three minutes. (*Id*. at 168.)

On May 30, 2003, a state agency medical consultant opined that plaintiff did not have a significant musculoskeletal impairment. (*Id*. at 189.) On June 19, 2003, the medical consultant assessed that plaintiff was able to walk for six hours, lift twenty pounds occasionally, and stoop and crouch occasionally. (*Id*. at 187.)

On August 14, 2003, plaintiff was examined by the orthopedist, Dr. Pluchinotta. (*Id*. at 198.) Plaintiff reported low back pain radiating to his right lower extremity, which worsened over the previous three years. (*Id*.) Upon examination, plaintiff was obese and had a normal gait. There was painful extension of the lumbar spine and tenderness in the right sacroiliac and L5-S1 regions. (*Id*.) Plaintiff, according to Patrick's test (*see Dorland's Illustrated Medical Dictionary* 1878 (30th ed. 2003)), tested positive for arthritis of the hip. There were normal ranges of motion of the hips and knees, and straight leg raising was negative. (*Id*.) Dr. Pluchinotta noted that x-rays from April 2003 reportedly revealed L5-S1 degenerative disc disease and sclerotic changes at the right sacroiliac joint. Dr. Pluchinotta ordered a computerized tomography ("CT") scan of the sacroiliac joints and lumbosacral spine, and instructed plaintiff to return in one to two weeks. (*Id.*) The CT scan revealed L5-S1 degenerative changes with narrowing of the

5

L5-S1 disc space, anterior and posterior osteophytes, and a central L5-S1 disc herniation. (*Id*. at 197.)

On January 27, 2004, plaintiff was examined by Dr. B. Rao Doddapeneni from the Department of Pain Management at Queens-Long Island Medical Group, P.C., who noted that plaintiff had severe recurrent low back pain since 1991 and severe pain, stiffness, and spasm radiating to the lower extremities. (*Id*. at 203.) His medications were neurontin, Celebrex, Lipitor, Norvasc and baby aspirin. Upon examination, plaintiff had restricted lumbosacral range of motion. (*Id*.) He was able to straight leg raise to seventy degrees bilaterally. Dr. Doddapaneni discussed various treatment options with plaintiff, including bed rest, physcial therapy, medication, weight loss, calcium, magnesium, glucosamine, and epidural blocks. (*Id*.) A TENS (transcutaneous electrical nerve stimulation) machine was prescribed. (*Id*.) On February 17, 2004, Dr. Doddapaneni administered an L4-L5 epidural block. (*Id*. at 202.) When plaintiff returned to Dr. Doddapaneni on March 16, 2004, he reported great improvement with the first epidural block, and a second epidural block was administered. (*Id*. at 201.)

On September 14, 2004, plaintiff returned to Dr. Spera, the cardiologist, for a follow-up examination. (*Id*. at 199-200.) Plaintiff reported that he was somewhat noncompliant with his cardiac medical therapy. (*Id.* at 199.) Plaintiff reported that he had not had chest pain since an episode in June 2004, and denied shortness of breath. (*Id*.) An EKG revealed a sinus rhythm pattern with a poor R-wave progression in leads V1 to V2. Stress EKG testing was negative for ischemia at submaximal heart rate. (*Id*.) Plaintiff was able to attain 61% of his target heart rate. The test was negative for chest pains or arrhythmias. (*Id*.) Dr. Spera stated that he would continue plaintiff's medical therapy (aspirin, Lipitor and Norvasc). (*Id.* at 199-200.) Plaintiff was also advised to lose weight and follow up with his regular doctor, Dr. Takeshige. (*Id*.)

On October 14, 2004, plaintiff's Lipitor was increased due to high cholesterol. (*See id*. at 196.)

At the hearing held on November 9, 2004, Gerald Greenberg, M.D., an internist, testified that plaintiff had coronary artery disease, and the evidence was compatible with occasional angina. (*Id*. at 218.) Dr. Greenberg stated that, given the objective evidence, it would be reasonable to preclude plaintiff from performing police work, but that the evidence did not document an inability to perform sedentary work. (*Id*. at 220.) Specifically, the doctor stated that plaintiff could sit from six to eight hours in a workday, stand up to two hours, walk up to two hours, and lift fifteen pounds occasionally and ten pounds frequently. (*Id*.)

E. The ALJ's Decision

The ALJ, on November 30, 2004, held that plaintiff "is not disabled and not entitled to a period of disability or disability insurance benefits under Title II of the Social Security Act." (*Id*. at 22.) After laying out the applicable law and making factual findings, the ALJ found, *inter alia*, the following:

(1) that plaintiff's "allegation of total disability . . . is not supported by the objective medical evidence and [his] actions," and his "testimony of pain and functional limitation was not fully credible and exaggerated the extent of his symptomatology."

6

(2) that, "[b]ased on the medical evidence, the [plaintiff's] testimony and the testimony of the medical expert . . . [plaintiff] is severely impaired by residuals of coronary artery disease, degenerative disease of the lumbosacral spine, and early degenerative disease of the left knee."

(3) that "[n]one of [these] impairments, however, alone or in combination, meet or equal the medical criteria for any impairment in the [l]isting of impairments in Appendix 1, Subpart P, Part 404 of the Regulations."

(4) that plaintiff "has retained the residual functional capacity to perform sedentary work; i.e. the ability to sit for six hours total, stand and/or [] walk for six hours total and lift and/or carry up to 10 pounds occasionally in an eight hour workday."

(5) that plaintiff cannot return to his past relevant work as a police officer.

(6) that plaintiff "is a younger individual, and age 18 to 44, with a high school education."

(7) that, based on his age and education, plaintiff is not disabled as directed by Rules 201.27-201.29 in Table Number 1 of Appendix 2, Subpart P, Part 404 [of] the Regulations.

(*Id*. at 21-22.) In reaching its findings, the ALJ considered "the entire record." (*Id*. at 22.)

II. DISCUSSION

A. Applicable Law

1. Standard of Review

A district court may only set aside a determination by an ALJ which is based upon legal error or not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quiones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotations and citations omitted). Furthermore, "it is up to the agency, not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 ("the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a *de novo* review") (quoting

*Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

### 2. The Disability Determination

A claimant is entitled to disability benefits under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown*, 174 F.3d at 62 (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability; and (4) claimant's educational background, age, and work experience." *Id*. (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

### B. Application

In opposing defendant's motion and cross-moving for judgment on the pleadings, plaintiff argues that the ALJ's finding that plaintiff was capable of performing sedentary work is not supported by substantial evidence. (Pl.'s Mem. at 11.) Specifically, plaintiff argues that the ALJ placed undue weight "on the findings of medical expert, Gerald Greenberg, M.D., who is neither a Board Certified Cardiologist nor a Board Certified Orthopedist." (*Id.*) Plaintiff also argues that "the full scope of plaintiff's disability could not be evaluated" because the ALJ "prohibited plaintiff's attorney from asking pertinent

questions of the claimant and the medical expert." (*Id.* at 15.) In particular, plaintiff contends that the ALJ did not permit plaintiff's attorney to inquire about a "typical day" in plaintiff's life and that the ALJ stopped the attorney when he sought to explore what household chores and activities plaintiff was able to perform. (*Id.*) Plaintiff also complains that his attorney was prevented from questioning the medical expert in detail about plaintiff's symptomology and the requirements of sedentary work. (*Id.* at 222.) Finally, plaintiff argues that the ALJ misconstrued certain vital areas of testimony, including plaintiff's testimony regarding his pain and ability to sit and stand and the medical evidence on his ability to perform sedentary work.

The ALJ applied the five-step procedure. As stated *supra*, the ALJ found at step three that plaintiff's impairments did not meet or equal the criteria of a "per se disabling" impairment listed in Appendix 1 to 20 C.F.R. 404, Subpart P. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 404.1525, 404.1526. The ALJ then found that plaintiff could not return to his past relevant work as a police officer, but determined that based on his residual functional capacity to perform sedentary work and vocational factors, that plaintiff could do other work. (Record at 21.) "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

1. Dr. Greenberg's Testimony

At the hearing, Dr. Greenberg, the medical expert, testified that based on the objective medical evidence, plaintiff was capable of sedentary work. More specifically, Dr. Greenberg stated that he could sit from six to eight hours in a workday, could stand up to two hours and walk up to two hours and could lift fifteen pounds occasionally and probably up to ten pounds frequently. (Record at 220-22

Plaintiff argues that the ALJ improperly relied on the testimony of Dr. Greenberg because Dr. Greenberg was not board certified in cardiology or orthopedics. The Court finds this argument unavailing. "Lack of board certification . . . is an insufficient basis to reject the opinion of the treating physician." *Gonzalez v. Chater*, No. 94-CV-8747 (KMW) (HBP), 1996 U.S. Dist. LEXIS 20835, at *24 (S.D.N.Y. Oct. 1, 1996) (collecting cases). On the same token, lack of board certification in specific areas is an insufficient basis to wholly reject the findings of a medical expert, who is a well-qualified physician, board certified internist and who is authorized to appear and testify regarding the record in social security cases. Furthermore, there is no indication that the ALJ placed undue weight on the testimony of the medical expert in particular; rather, the medical expert's testimony was only one consideration. The ALJ fully considered the entire record, which included not only the medical expert's testimony, but also the medical evidence and the claimant's own testimony. (Record at 21-22.) However, as stated *infra*, the ALJ did not sufficiently develop the record regarding the plaintiff's credibility and failed to make specific findings as to plaintiff's credibility that include plaintiff's work history.

### 2. The Questioning

Plaintiff argues that the record was not properly developed because the ALJ prohibited plaintiff's counsel from inquiring about "a day" in plaintiff's life and what household chores and activities plaintiff was able to perform. However, the ALJ had already questioned plaintiff regarding his daily activity and plaintiff had informed the ALJ that he watches TV about nine to ten hours a day. (*Id.* at 214.) The ALJ made this clear when he instructed plaintiff's attorney that plaintiff already described a typical day: "He gets up. He takes his meals. He goes to the TV. He watches his TV and he's pretty well described his typical day." (*Id.* at 217.) Furthermore, plaintiff's counsel did not object to this description of plaintiff's typical day at the hearing. Plaintiff's counsel then continued to inquire about household chores and plaintiff testified that he did not do any housework. (*Id.* at 217.) The ALJ stopped counsel after he thereafter asked plaintiff whether he did any specific chores including shopping, laundry, taking care of pets, running errands – all to which plaintiff responded no. (*Id.* at 217.) The Court finds that the ALJ did not prevent the plaintiff from properly developing the record when he stopped the specific questioning. The record reflected that plaintiff does not perform any chores and it was purely redundant for plaintiff's counsel to go through a list of each specific chore. The record was also clear that plaintiff spent the majority of his day laying on the couch and watching TV. Accordingly, the evidence regarding plaintiff's "typical day" was not undeveloped.

It was also not improper for the ALJ to direct the expert not to answer the question posed to him by plaintiff's attorney:

> Would it be . . . medically reasonable for an individual suffering from a hear condition such as documented as the claimant's with the complaints of chest pain and fatigue as he has testified with the back problems, back pain, he has testified to and some painful knee as he has testified to limit his ability to sit?

(*Id.* at 222.) The ALJ has a duty to fully develop the record. The medical expert's opinion on whether it is medically reasonable for plaintiff to limit his own ability to sit is not relevant to the issue of whether plaintiff is medically capable of sitting. Accordingly, the ALJ did not err in not permitting Dr. Greenberg to answer the question posed by plaintiff's counsel.

### 3. Plaintiff's Credibility

Finally, plaintiff argues that the ALJ "misconstrued certain vital areas of testimony" and, in particular, should have given more credence to plaintiff's subjective complaints of pain and immobility. (Pl.'s Mem. at 16-17.)

"[W]here a claimant's subjective testimony is rejected, the ALJ must do so explicitly and specifically." *Kleiman v. Barnhart*, No. 03-CV-6035 (GWG), 2005 U.S. Dist. LEXIS 5826, at * 32 (S.D.N.Y. Apr. 8, 2005) (citing *Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988) (where an ALJ rejects witness testimony as not credible, it must set forth the basis for this finding "with sufficient specificity to permit intelligible plenary review of the record"). Here, the ALJ found "[t]he claimant's testimony of pain and functional limitation was not fully credible and exaggerated the extent of his symptomatology." (Record at 22.) Specifically, the ALJ stated that "there is no evidence that the claimant sought or received any treatment for back pain from the date he stopped working until August 2002" and that "[i]t is reasonable to assume that [sic] the claimant was experiencing the degree of

pain and functional limitation that he has alleged, that he would have sought treatment." (*Id.* at 21.) The ALJ made the same determination with respect to plaintiff's complaints regarding his left knee. (*Id.*) The ALJ additionally pointed out that physical examinations showed "minimal cardiac pathology since [plaintiff] underwent successful stenting" and that plaintiff "admitted a lack of full compliance with his treatment regimen." (*Id.*)

Plaintiff argues, however, that his testimony was entitled to credibility because of his long and honorable work history in which he spent nineteen years at the New York City Police Department before his retirement. (Pl.'s Mem. at 16.) Plaintiff is correct that the statements of a claimant with a solid work record such as his are entitled to substantial weight. *See Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."). The ALJ failed to take into account plaintiff's work history when making specific findings rejecting his credibility. *See Montes-Ruiz v. Chater*, No. 97-CV-6013, 129 F.3d 114 (table), 1997 U.S. App. LEXIS 32217, at * 8 (2d Cir. Nov. 14, 1997) (remanding case where ALJ failed to take plaintiff's work record into account when making specific findings as to plaintiff's credibility); *accord Burgos v. Barnhart*, No. 01-CV-10032 (RCC) (DF), 2003 U.S. Dist. LEXIS 14407, at *46 (S.D.N.Y. Aug. 20, 2003); *Pena v. Barnhart*, No. 01-CV-502 (BSJ)(DF), 2002 U.S. Dist. LEXIS 21427, at *36 (S.D.N.Y. Oct. 29, 2002).

The ALJ found that plaintiff's testimony was not credible because plaintiff had not sought or received treatment for back pain from the date he stopped working until August 2003 and had not sought or received treatment for the left knee problem since he stopped working, except on one occasion in July 2002 and noted plaintiff's lack of full compliance with treatment. The Court finds, however, that this alone is not a compelling reason to reject plaintiff's testimony regarding his pain. *See e.g., Shaw v. Chater*, 221 F.3d 126, 133 (2d Cir. 2000) ("Just because plaintiff's disability went untreated does not mean he was not disabled."); *see also Blizzard v. Barnhart*, No. 03-CV-10301 (GWG), 2005 U.S. Dist. LEXIS 6938, at *30-31 (S.D.N.Y. Apr. 25, 2005) ("Even where a claimant has not been treated at all for a substantial period of time, a gap in treatment will not automatically negate a finding of disability.").

Furthermore, the ALJ failed to develop the record on plaintiff's alleged failure to fully comply with his treatment regimen and failure to receive treatment on more than one occasion. If the ALJ was relying on plaintiff's failure to seek treatment as a basis to reject his credibility regarding his pain, then the ALJ, at a minimum, should have inquired into the reasons for plaintiff's decision not to seek treatment on his back until August 2003 and why he received treatment for his knee only once in July 2002.

In addition, "[w]hen the ALJ establishes that a claimant suffers from a 'medically determinable impairment which could reasonably be expected to produce the type of pain of which a clamant complains, the [Commissioner] may not ignore subjective evidence as to the severity of the pain caused by the impairment.'" *Maier v. Chater*, No. 95-CV-9264 (JGK), 1997 WL 570938, at *7 (S.D.N.Y. 1997) (quoting *Diaz v. Bowen*, 664 F. Supp. 726, 730 (S.D.N.Y. 1987)). Here, plaintiff's complaints of pain are consistent with the ALJ's finding that plaintiff is severely impaired by residuals of coronary artery disease, degenerative disease of the lumbosacral spine, and early degenerative disease of the left knee. Thus, it was

improper for the ALJ to disregard the subjective evidence because plaintiff did not seek more treatment, without further inquiry. Accordingly, the Court concludes that the ALJ's finding that plaintiff's testimony was not entirely credible is not supported by the record.

### 4. Remand or Reversal

Plaintiff argues that the case should be reversed solely for the computation of benefits, or in the alternative remanded for more appropriate review. When "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," reversal is appropriate. *McKay v. Barnhart*, 302 F. Supp. 2d 263, 265 (S.D.N.Y. 2004) (citing *Parker v. Harris*, 626 F.2d 225, 233 (2d Cir. 1980.) However, remand is appropriate where "there are gaps in the administrative record or the ALJ has applied the improper legal standard." *Rosa v. Callahan*, 168 F. 3d 72, 82-83 (2d Cir. 1999.) Here, remand is the appropriate remedy so that the ALJ can evaluate plaintiff's credibility in light of all the available evidence in the record, including plaintiff's work history, and can further develop the record on plaintiff's failure to seek additional treatment on his knee and back.

## III. CONCLUSION

For the reasons stated above, defendant's motion is denied and the plaintiff's motion is granted in part and denied in part. The Commissioner's decision, denying the plaintiff benefits, is vacated and the case is remanded for further proceedings pursuant to 42 U.S.C. § 405(g). The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 25, 2006
Central Islip, NY

\* \* \*

The attorneys for the plaintiff are Jeffrey L. Goldberg, Esq. and Chester P. Lukaszewski, Esq., 2001 Marcus Avenue, Lake Success, New York 11042. The attorney for the defendant is John M Kelly, Esq., Special Assistant United States Attorney, Roslynn R. Mauskopf, Esq., United States Attorney, Eastern District of New York, One Pierrepont Plaza, 14th Floor, Brooklyn, New York 11201.